IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OLIVER LAWAL, DAOSAMID BOUNTHISANE, and GAZALI SHITTU, | : : : | |
| Plaintiffs | : : | CIVIL ACTION NO.: |
| v. | : : | 2:12-CV-3599-CDJ |
| MARK MCDONALD and JOHN DOES 1 & 2, | : : : | |
| Defendants | : | |

**MEMORANDUM**

**Judge C. Darnell Jones, II**                                                                                    **March 13, 2015**

Pending before the court is a motion to dismiss, (Doc. No. 32), filed by defendant Mark McDonald on behalf of himself and John Does 1 & 2.[1] Defendant seeks dismissal of plaintiffs' excessive force (Count I) and unconstitutional detention (Count II) claims on the grounds that no excessive force was used when plaintiffs were restrained, defendants were cloaked with qualified immunity, plaintiffs failed to allege personal involvement, and the statute of limitations has expired. To the extent the motion to dismiss seeks dismissal of any claims against John Doe defendants, the court will in its discretion abstain from ruling at this stage.[2] After a thorough review of the parties' filings, the motion to dismiss will be **DENIED IN ITS ENTIRETY** insofar as it seeks dismissal of plaintiffs' claims against defendant McDonald.

---

[1] Plaintiffs have not yet identified John Doe defendants by name.
[2] As defendant notes, the U.S. Attorney's Office may only represent federal officials after representation has been requested by the official and approved by the Department of Justice. At this juncture, the U.S. Attorney's office does not represent John Doe defendants. Therefore, the court will review any defenses to plaintiffs' claims against John Doe defendants at such time as they are identified by name and represented by counsel.

**BACKGROUND**

Between 2008 and 2010, defendant Mark McDonald, a federal immigration officer with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), conceived a plan to identify and investigate Philadelphia taxi cab drivers suspected of immigration violations. (Sec. Am. Compl. at ¶11.) He contacted the enforcement manager of the Philadelphia Parking Authority's ("PPA") taxicab and limousine division and requested a list of all taxicab drivers certified to operate in Philadelphia. (*Id.* at ¶12.) After receiving a list of names with birth dates and Social Security numbers, defendant McDonald began compiling a list of drivers, including plaintiffs, whose immigration status he could not verify.[3] (*Id.* at ¶¶14, 16.)

On June 23, 2010, the PPA distributed a letter at the direction of defendant McDonald to a number of cab drivers on the investigation list. (*Id.* at ¶¶16-17.) The letter informed the recipients that an independent audit had revealed they were eligible for a refund from PPA and requested they report to PPA headquarters on June 30, 2010,[4] between 8:00 a.m. and 10:00 a.m. to receive their refund.[5] (*Id.* at ¶¶31-32.) On June 30, all three plaintiffs arrived as scheduled, plaintiff Shittu at 8:30 a.m., plaintiff Bouthisane at 9:00 a.m., and plaintiff Lawal at 9:30 a.m. (*Id.* at ¶¶38-40.) They were called individually to

---

[3] Plaintiffs allege that the PPA routinely collected and updated information on cab drivers' immigration status but claim defendant McDonald never requested the data. (Sec. Am. Compl. at ¶21.) However, it is unclear as to whether defendant McDonald was aware that this information existed. Plaintiffs also allege that defendant failed to run their names through government databases that could have identified them as U.S. citizens and failed to compare their names and social security numbers. (*Id.* at ¶¶26-27.) Nevertheless, the Third Circuit has concluded that the inclusion of plaintiffs' names on the list and their initial detention did not violate the Constitution, so plaintiffs are precluded from raising those claims in their amended complaint.

[4] The PPA first sent a letter instructing the drivers to arrive at 9:30 a.m. on June 23, 2010, "in order to claim their money and to 'hold [any] questions and phone calls until then.'" (Sec. Am. Compl. at ¶29.) However, ICE rescheduled the operation for June 30, 2010. (*Id.* at ¶30.) To avoid raising suspicion, the second letter explained the date change as a scheduling mistake on the part of PPA. (*Id.* at ¶30.)

[5] Arrival times were staggered. Drivers who were thought to be in the United States illegally were given an earlier arrival time while drivers whose status was simply unknown were scheduled later.

speak with a plainclothes officer who collected their personal information and verified their identification. (*Id.* at ¶41.) They were then instructed to follow a second plainclothes officer to another room to collect their respective refunds. (*Id.*)

Upon entering the second room, which was described as "darkened," plaintiffs were "immediately and violently grabbed by two [immigration officers] and slammed up against a wall, facing the wall." (*Id.* at ¶44.) The officers allegedly "used their bodies to pin the driver's head and neck to the wall so he could not move," "used metal handcuffs to cuff each [p]laintiff's wrists behind his back, and yelled words to the effect of 'immigration police, you're under arrest.'" (*Id.*) After searching plaintiffs and seizing their personal effects, ICE officers escorted them to a "large garage space" for "processing." (*Id.* at ¶¶54, 56.)

Upon arriving in the garage, plaintiffs were fingerprinted, photographed and tagged with a wristband. (*Id.* at ¶56.) They were then moved to another table where they were interrogated. (*Id.* at ¶57.) Once their citizenship status was confirmed, immigration officials "told [them] that [they] had been mistakenly arrested and detained." (*Id.* at ¶63.) Government agents removed plaintiffs' handcuffs and "escorted [them] to another part of the garage with rows of chairs set up facing the center of the garage." (*Id.* at ¶65.) Immigration agents told plaintiffs to be seated, and John Doe defendants told them they were not permitted to leave the premises. (*Id.* at ¶¶67-70.) "Plaintiffs Lawal and Shittu tried to speak to each other, but armed agent John Doe 2[] ordered them to stop speaking[] and separated them, directing them to move to seats further apart so they could not communicate." (*Id.* at ¶71.) Plaintiffs were under constant surveillance with the exception of visits to the restroom and were detained until 11:30 a.m. when the operation

3

concluded.[6] (*Id.* at ¶¶73, 77, 81.) At that point, their belongings were returned, and they were escorted off the property. (*Id.* at ¶81.) In total, plaintiffs Lawal and Shittu were in police custody for a total of three hours – two hours after their citizenship was determined. (*Id.* at ¶¶77-78.) Plaintiff Bounthisane was in custody for a total of three hours – one hour after his citizenship was confirmed. (*Id.* at ¶80.)

On June 26, 2012, plaintiffs filed a complaint in the United States District Court for the Eastern District of Pennsylvania. (Doc. No. 1.) Defendants moved to dismiss, (Doc. No. 5), and plaintiffs amended their complaint as a matter of course pursuant to Federal Rule 15, (Doc. No. 6). On November 6, 2012, defendants again moved for dismissal, (Doc. No. 8), and this court issued a memorandum and order dismissing the complaint with prejudice, (Doc. Nos. 13 & 14). The court found that plaintiffs had failed to plead personal involvement and concluded that each defendant was entitled to qualified immunity. (*Id.*) Plaintiffs appealed the dismissal, and the Third Circuit, holding that the complaint failed to properly allege personal involvement, affirmed in part, vacated in part, and remanded with leave to file a second amended complaint. *Lawal v. McDonald*, 546 F. App'x 107, 114 (3d Cir. 2014). On May 27, 2014, plaintiffs filed a two-count second amended complaint raising excessive force and unconstitutional seizure claims under the Fourth Amendment. (Doc. No. 27.) Defendant McDonald filed a motion to dismiss, which the parties have fully briefed.[7] Therefore, the motion to dismiss is ripe for disposition.

---

[6] The operation was originally scheduled from 8:00 a.m. to 10:00 a.m., but several people arrived late. (Sec. Am. Compl. at ¶31.)

[7] While defendant John Does 1 & 2 have not filed motions (because they have not yet been identified by name), defendant McDonald moved for dismissal on their behalf.

4

**STANDARD OF REVIEW**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation and citation omitted). After the Supreme Court's decision in *Bell Atl. Corp. v. Twombly*, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

**DISCUSSION**

**Plaintiff Adequately Alleged Excessive Force**

Defendant moves to dismiss Count I on the grounds that the alleged conduct did not constitute excessive force. The Supreme Court has long held, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)). When measuring the use of force in the context of an arrest, courts must look at "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Green v. New Jersey State Police*, 246 F. App'x 158, 161 (3d Cir. 1997) (quoting *Graham v. Connor*, 490 U.S. 386, 396

5

(1989)). "A court in making a reasonableness assessment also may consider the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004).

In this case, the allegations show that plaintiffs posed no immediate threat to the safety of the officers. Plaintiffs appear to be completely unaware that they were suspects in a police operation right up until they were handcuffed, and the crimes for which they were detained lacked a violent element. There are no allegations that they were carrying weapons of any sort or had violent propensities. In sum, nothing appears to have alerted police that they would pose any danger to immigration officers. Of course, safety must be assessed from the perspective of a reasonable officer on the scene, *Carswell v. Borough of Homestead*, 381 F.3d 235, 240 (3d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) ("Reasonable is to be evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"), but nothing suggests defendant had any reason to believe plaintiffs were a danger to arresting officers.

In this case, the risk of flight also seems remote. First, plaintiffs were under the impression that they were asked to PPA headquarters to receive a refund, so defendants were operating with the element of surprise. Second, plaintiffs were led to a dark, unfamiliar room inside the PPA where they were immediately surrounded by agents. These circumstances mitigated the risk of flight significantly. Moreover, although police had to contend with a large number of suspects, the complaint makes it clear that the operation was designed in such a way as to sequester the arrival time of the suspects so ICE agents

6

only had to "process" one suspect at a time. In sum, it is sufficiently alleged that defendants engaged in a carefully planned and orchestrated operation to investigate the immigration status of suspects that appeared to pose no danger to police officers and were unlikely to mount an effective getaway. With that in mind, the court must now analyze the degree of force used by defendants.

The complaint's allegations concerning the use of force are somewhat amorphous, not as a result of careless pleading, but because verbal descriptions of force are often subject to interpretation. The complaint states:

> In accordance with the protocol, the agent opened the door to a darkened room and ushered each driver inside a room with five armed federal agents in raid gear, where the driver was *immediately and violently grabbed by two unknown people and slammed up against a wall, facing the wall. The assailants used their bodies to pin the driver's head and neck to the wall so he could not move.* The assailants used metal handcuffs to cuff each Plaintiff's wrists behind his back, and yelled words to the effect of, "immigration police, you're under arrest." Each driver was then searched, and all of his personal effects (such as wallet and phone) and his belt were confiscated and immediately placed into evidence bags and sealed. Each driver was detained here for several minutes, given no opportunity to ask any questions or defend himself, and then was moved to another area for processing.

(Compl. at 8-9.)

The terminology used by plaintiff – "violently grabbing" and "slamming up against a wall" – are certainly open to interpretation, *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)), and could lie anywhere along the spectrum of force, the extreme end of which could be considered excessive. At this stage the court must read the complaint in the light most favorable to the plaintiff, and it appears that, all factors considered, plaintiff has stated a plausible claim for excessive force.

**<u>Plaintiffs Sufficiently Pled Personal Involvement</u>**

Defendant McDonald also moves to dismiss Counts I & II of the complaint on the basis that plaintiff failed to allege personal involvement. "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Evancho v. Fisher*, 423 F.3d 437, 354 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). Here, plaintiffs allege that defendant McDonald detained them for hours after their U.S. citizenship had been established.

The complaint contains a number of allegations concerning defendant McDonald's personal involvement. Of course, the court must separate factual allegations from legal conclusions and any "formulaic recitation of the elements," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but the allegations in plaintiffs' complaint suffice to create a reasonable inference that McDonald was personally involved in the allegedly unconstitutional conduct. First of all, plaintiff alleges that he was in charge of the operation. (Compl. at 3.) Second, plaintiff alleges that McDonald was on location during the operation and that he conducted a "walk-through" of the PPA facility several weeks before. Furthermore, McDonald allegedly reported to a superior "that the operation was unfolding according to plan," (Doc. No. 7), while on-site directing the operation, indicating that he was actively supervising a carefully choreographed plan. Finally, plaintiff states:

> At some point on June 30, 2010, while [p]laintiffs were being detained, [d]efendant McDonald learned that his team had arrested and detained U.S. citizens, and that his team had taken steps to ensure that [p]laintiffs remained onsite even after their citizenship had been verified in order to

8

> minimize the risk that they would tip off other cab drivers about the sting. Upon information and belief, [d]efendant McDonald did nothing to prevent [p]laintiffs being detained against their will even after his team had verified [p]laintiffs' U.S. citizenship.

(Compl. at ¶76.)

These allegations, when read in conjunction, portray a defendant who was directly and intimately involved in the operation. They certainly permit a plausible inference that defendant McDonald directed the conduct at issue or was aware of and acquiesced to it.

**Qualified Immunity**

Finally, defendant argues that defendant McDonald is entitled to qualified immunity on plaintiffs' Fourth Amendment seizure claim. The first question in a qualified immunity claim is whether there was a constitutional or statutory violation. *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000) ("[a]s the Supreme Court recently emphasized, when the defendant in a §1983 action claims qualified immunity, our first task is to assess whether the plaintiff's allegations are sufficient to establish the violation of a constitutional or statutory right at all") (citation omitted). If so, the court must then decide whether the conduct in question "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Thomas v. Independence Tp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)). The court will address each issue in turn.

The complaint states that John Doe defendants were detained for up to two hours after ICE agents had verified their citizenship. By that point, there was no probable cause or reasonable suspicion that plaintiffs had engaged in illegal conduct. When this matter was previously on appeal, the Third Circuit set forth the test to determine whether plaintiffs' detention was reasonable:

9

> [Plaintiffs] have alleged that they were barred from leaving the PPA facility even though Defendants no longer had probable cause to continue holding them or reasonable suspicion that they violated the immigration laws. Determining whether or not this continued seizure was justified requires that we balance "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Maryland v. Buie*, 494 U.S. 325, 331, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (citations omitted). In conducting this balancing test, courts weigh the duration, nature and quality of the intrusion, the governmental interests – such as crime prevention and detection, officer safety, evidence destruction, and control over an operation – alleged to justify the intrusion, and the individual's Fourth Amendment interests in being free from seizure. *See, e.g., Illinois v. McArthur*, 531 U.S. 326, 336, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (holding an officer lawfully prevented defendant from entering his home for two hours while obtaining a search warrant for drugs based on a tip); *Baker v. Monroe Twp.*, 50 F.3d 1186, 1191-92 (3d Cir. 1995) (holding it was reasonable for police to force individuals onto the ground and detain them for 25 minutes during a dangerous, "swiftly developing" drug raid).

*Lawal v. McDonald*, 546 Fed App'x 107, 113 (3d Cir. 2014).

In this case, the predominant weight of the factors tips in favor of a finding that plaintiffs' detention was unreasonable.[8] First, the detention was lengthy. The complaint alleges that plaintiff Bounthisane was detained for one hour after he was cleared as a U.S. citizen and plaintiffs Lawal and Shittu were detained for two hours after they were cleared as U.S. citizens. Second, plaintiffs' detention represents a significant intrusion upon their freedom. Although their handcuffs were removed, they were restricted from leaving the PPA building, separated from one another, told they must remain seated, and ordered to refrain from speaking. They were under constant supervision by armed ICE agents except during restroom breaks.[9] Third, the court is unable to comprehend any threat to officer safety. Plaintiffs were searched during their initial detention, and the record does not show

---

[8] Plaintiffs only allege that their detention was unconstitutional after their citizenship was confirmed. Therefore, the court will only weigh the government's interest against plaintiffs' Fourth Amendment rights in regards to their detention after they were investigated.

[9] Plaintiffs state, "[o]ther than when they were using the restroom, Plaintiffs were watched and guarded by armed federal agents at all times." (Sec. Am. Compl. at ¶73.) They also allege, however, that ICE agents escorted them to the bathroom. (*Id.* at ¶72.)

10

that plaintiffs exhibited any signs of danger to officers. As to evidence destruction, the complaint alleges that plaintiffs were found to be U.S. citizens prior to the period of detention in question. Therefore, there was no criminal evidence to destroy.

The government argues that they detained plaintiffs to maintain control over their operation, particularly to prevent plaintiffs from tipping off other suspects. Such a concern presents itself in any complex police operation. Defendants have not convinced the court that plaintiffs were likely to interfere with the continuing operation in any way. Nothing suggests plaintiffs were likely to communicate to other suspects about the ongoing operation, whether in casual conversation or for more nefarious reasons. The court does not believe that the government's interest in controlling the operation outweighs plaintiffs' freedom. Of course, at this stage the court's inquiry is limited to the four corners of the complaint. Looking at the totality of the circumstances,[10] the court must conclude that plaintiffs' detention violated the Fourth Amendment.

The next question is whether defendants "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Thomas v. Independence Tp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)). Defendant points to several Supreme Court cases in support of qualified immunity, but the facts of those cases demonstrate that they have limited application here. They all hold that a person may be detained temporarily *during* the execution of a search warrant or *while* a search warrant is being obtained, not *after* the search is completed. *Michigan v. Summers*, 452 U.S. 692, 705 (1981) ("[t]hus, for Fourth Amendment purposes,

---

[10] The Supreme Court has explained that Fourth Amendment inquiries must be conducted by looking at the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 417, 421 (1996) (explaining that Fourth Amendment questions turn on reasonableness and that reasonable is measured by totality of circumstances)

11

we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is being conduct"); *Muehler v. Mena*, 544 U.S. 93, 98-100 (2005) (2-3 hour detention during premises search not unconstitutional). The government's detention of plaintiffs in this case was not contemporaneous to the investigation into their citizenship. They were confirmed to be U.S. citizens and then subsequently held in custody. To be sure, ICE was still investigating other suspects at the PPA building contemporaneously to plaintiffs' detention. However, the court believes the relevant time period for purposes of this court's Fourth Amendment inquiry is determined by the investigation into plaintiffs' citizenship, not the investigation into every cab drivers' citizenship on the date of the ICE operation. The government had no probable cause or reasonable suspicion to detain plaintiffs after their citizenship had been established. Therefore, defendant is not entitled to qualified immunity.

## CONCLUSION

In light of the foregoing, the court concludes that plaintiffs properly alleged personal involvement and excessive force. The court further finds that defendant McDonald is not entitled to qualified immunity. Therefore, defendant's motion to dismiss will be **DENIED IN ITS ENTIRETY**. An appropriate order will follow.

BY THE COURT:

/s/ C. Darnell Jones, II   J.
C. DARNELL JONES, II   J.